## IN RE ADOLFO PORRATA DORIA, Respondent.

No. 79.    Argued May 6, 1952.—Decided September 15, 1952.

*Félix Ochoteco, Jr.,* and *Benicio Sánchez Castaño* for respondent.    *J. Rivera Barreras, Fiscal of the Supreme Court,* for the People.

PER CURIAM: On July 5, 1949, we rendered judgment in the case of *Rivera* v. *Heirs of Díaz* affirming the judgment entered by the former District Court of San Juan, 70 P.R.R. 168.    In pursuance of footnote 11 of the opinion in support of our judgment,[1] we ordered the *Fiscal* of this Court, on that same date, to conduct an investigation into the professional conduct of Adolfo Porrata Doria, attorney-at-law.    The report was submitted on February 20, 1950, and on the following March 7 we ordered the *Fiscal* to institute, within 30 days, disbarment proceedings against said attorney.    In the complaint filed as ordered, the *Fiscal* makes seven charges which, briefly stated, are:

First: That Ramón Pastor Díaz Molinary died on November 4, 1939, leaving an estate of approximately $600,000 and as his sole and universal heirs his legitimate son Ignacio Díaz Luzunaris, his acknowledged natural son Ramón Díaz Rivera and his widow Eustacia Luciano Maldonado; that Díaz Rivera was declared an acknowledged natural child of Díaz Molinary, with all inherent rights, by final and un-

---

[1] See page 184 of the opinion.

appealable judgment of the District Court of Guayama; that since the hereditary estate was estimated to be worth $600,000, Díaz Rivera was entitled to the share determined by law in his father's inheritance; that from an early age Díaz Rivera had been an incompetent who suffered from oligophrenia, incapable of comprehending the scope of a transaction, because he was a moron, a mental weakling; and that on February 28, 1940, despite being aware of the foregoing facts, Porrata Doria, who had been his attorney in the filiation suit, authenticated a deed by virtue of which Ramón Díaz Rivera assigned and conveyed to Ignacio Díaz Luzunaris his hereditary rights in his father's inheritance for $10,000 which ridiculous and grossly inadequate amount rendered nonexistent the deed of settlement on account of Díaz Rivera's lack of legal capacity to consent.

Second: That Porrata Doria exerted undue influence on the aforesaid incompetent in order to benefit Ignacio Díaz Luzunaris, upon advising Díaz Rivera to accept a settlement for $10,000, notwithstanding Porrata Doria's own admission that he should not compromise Díaz Rivera's hereditary rights for less than $25,000.

Third: That Porrata Doria set forth in the deed of settlement that upon the execution thereof a certified check for $10,000, payable to Díaz Rivera, was delivered to the latter, which fact was false and Porrata Doria knew it.

Fourth: That Porrata Doria failed to comply with his duties as an officer of the District Court of Guayama at the hearing in the filiation suit upon failing to appraise the court of the true legal situation to the effect that the parties had made a settlement through a previous agreement.

Fifth: That on November 14, 1939, a contract for professional services was signed, wherein Ramón Díaz Rivera and his mother appeared as parties of the first part, and Porrata Doria, Juan Ramírez Viñas and Manuel Carrasquillo Herpén, as parties of the second part, the second clause

of which recited that the parties expressly agreed and stipulated that no party could enter into any extrajudicial agreement or transaction without the agreement and consent of the other party, and that notwithstanding, Porrata Doria drew up a document of "Agreement of Settlement" on January 19, 1940, to be signed only by Ramón Díaz Rivera and Ignacio Díaz Luzunaris which document was signed by the parties without Josefa Rivera's knowledge.

Sixth: That in the "Agreement of Settlement" —which bound Díaz Rivera as well as Díaz Luzunaris—Porrata Doria did not obtain the latter's signature to the copy he retained and permitted Agustín E. Font, counsel for Díaz Luzunaris, to retain the original despite the fact that the document stated that "in agreement with the contents hereof Mr. Ignacio Díaz Luzunaris subscribes and expresses his conformity to the contents hereof"; and that this action of Porrata Doria prejudiced the rights of his client Díaz Rivera and benefited Díaz Luzunaris, inasmuch as the latter was free to fulfill said agreement, while only Díaz Rivera was bound thereby.

Seventh: That despite having signed the aforesaid "Agreement of Settlement" for $10,000 on February 28, 1940—the date of the hearing in the filiation suit—Porrata Doria informed Mr. Juan Ramírez Viñas, who also acted as attorney for Díaz Rivera, that he had been offered $7,500 as a settlement, but that he had refused to accept it. The complaint ends alleging that the charges constitute immoral, reprehensible and improper conduct of a serious nature, as well as grave misconduct in the performance of his duties as an attorney and notary; and praying that after the proper legal proceedings this Court disbar Porrata Doria from practice as an attorney and notary.

The respondent answered accepting Ramón Pastor Díaz's death, denying that the latter left an estate of approximately $600,000 and alleging, to the contrary, that after a thorough

inventory and valuation the said estate was found to be worth approximately $290,664.44 from which sum $62,504.82 had to be deducted, there remaining a balance of $228,159.62 as the net amount of the estate to be distributed among his heirs; that the acknowledged natural son Ramón Díaz Rivera was entitled to one sixth of that sum; and that he never knew, nor could he even suspect, that since his tender years Díaz Rivera had been mentally unsound and suffered from oligophrenia. He claimed that he never induced or urged Díaz Rivera to assign and convey to said Ignacio Díaz Luzunaris his hereditary rights for $10,000; that that was Díaz Rivera's own wish after having been prevented from settling for a lesser sum; and that even though he—the respondent—did everything possible to obtain more than $10,000, he does not consider that sum ridiculous or grossly inadequate considering the circumstances and nature of the case, namely, that the District Court of Guayama had already dismissed the filiation suit; that in reversing the judgment entered by said court, this Court insinuated that the evidence was not sufficient; that certain suits involving a considerable amount of money were pending against Pastor Díaz in the District Court of Guayama; that almost all of the witnesses who originally testified in the filiation suit had died or their whereabouts were unknown; that the testimony of Josefa Rivera herself, plaintiff's mother, was questionable and full of contradictions; and that said sum was delivered to Díaz Rivera without the latter being liable for any obligation in connection with the hereditary estate, and was exempt from the payment of inheritance taxes.

The respondent also denied that he exercised undue influence on Díaz Rivera or that he acted for the purpose of benefiting Ignacio Díaz Luzunaris or prejudicing his client. He alleged that the $10,000 certificate delivered to Díaz Rivera is duly identified in the deed and that Díaz Rivera cashed in the entire amount and paid $5,000 to his attor-

neys, deposited $4,500 in the Banco Crédito y Ahorro Ponceño, Guayama Branch, and kept $500 in cash with him; that the parties and their attorneys had an interview with the judge of the District Court of Guayama in the office of the judge who was informed of the developments up to that time; that Mrs. Josefa Rivera was present when the agreement of settlement was executed on January 19, 1940, and expressed her conformity thereto; that the original and several copies of said agreement were signed both by Ignacio Díaz Luzunaris and by Ramón Díaz Rivera and that he retained some of the copies signed by both; that he kept his colleagues Carrasquillo Herpén and Ramírez Viñas informed of every step and act performed in connection therewith and of all the proposals of settlement he received.

In view of the fact that a great number of witnesses had to be examined in this case, on November 21, 1950, this Court appointed Mr. Enrique Córdova Díaz, an attorney-at-law, to hear and receive, in the presence of both parties and in his capacity as Master, any evidence presented by the parties. It was determined that the witnesses had to testify under oath. We also decreed in our order that if any evidence were objected to it would be admitted, with the grounds for the objection, and that after hearing all the evidence, it was the Master's duty to certify it immediately and to send it to the Court with his findings of fact.

Mr. Córdova Díaz accepted the designation and proceeded to hear and receive the evidence offered by the parties. He held thirteen hearings and both parties, according to his report, introduced "extensive oral and documentary evidence" which was sent to us together with his report. After specifying the seven charges contained in the complaint and setting forth the allegations made by respondent in his answer, the Master informs us in his report that the main issues in controversy may be considered under the following points:

"1) The value of Ramón Pastor Díaz's inheritance on or about the date of the settlement of January 19, 1940.

"2) The legal share of Ramón Díaz Rivera, as a natural child, in Ramón Pastor Díaz's inheritance.

"3) Ramón Díaz Rivera's incapacity and the respondent's knowledge of his mental condition on the date of the settlement.

"4) The reasonableness of the settlement.

"5) The undue influence exerted by the respondent on Ramón Díaz Rivera to accept the settlement, and the fact that Josefa Rivera, Ramón Díaz Rivera's mother, was ignored in the agreement of settlement of January 19, 1940.

"6) The fact that the deed of settlement of February 28, 1940, recited that a certified check for $10,000, instead of a certificate of deposit for that same amount, was delivered to Ramón Díaz Rivera.

"7) Respondent's failure to inform the District Court of Guayama of the agreement of settlement executed on January 19, 1940, when the filiation suit was heard on February 28, 1940.

"8) The failure to obtain the signature of the parties to the copy of the agreement of settlement of January 19, 1940, which the respondent kept as Ramón Díaz Rivera's attorney.

"9) The fact that the respondent informed his colleague Ramírez Viñas on the date of the hearing in the filiation suit —February 28, 1940—that there was an offer to settle for $7,500, when the agreement of settlement for $10,000 of January 19, 1940, had already been signed.

"10) Respondent's professional reputation."

The Master forthwith discusses those points one by one. In connection with the first one he indicates that in his opinion the actual market value of the real property left by Pastor Díaz was approximately $325,000 in 1940, having taken into consideration in order to reach that conclusion, the value of the leases of the properties leased for a ten-year period to Wirshing & Cía., capitalizing the rentals in accordance with the testimony of Julio Santiago García, a Public Accountant; that he considered that the amount of $30,000 was a fair estimate of the value of the remaining properties, his conclusion, therefore, being that the hereditary estate

was worth approximately $355,000; that deducting a liability amounting to $25,000, plus an item of $10,000, to cover the expenses incurred in connection with certain pending suits the net result was approximately $315,000 (*sic*); that he considered that the community property of the widow, who married the predecessor about three years before his death, amounted to $40,000, that is, not more than $20,000 for the widow; and that in his opinion Ramón Pastor Díaz's hereditary estate, after deducting the liabilities and the estimated community property, amounted to approximately $295,000 in 1940. The Master goes on to state in his report that "we think that the net value of the distributable estate was approximately $295,000. We can not require the respondent, upon considering his professional conduct herein, to have reached this same conclusion, but giving him the benefit of the doubt in the light of the facts he knew or which were within his reach, and considering his own conclusion that it was only fair to settle for $25,000, we do not feel that he could reasonably think that the net value of said inheritance was less than about $230,000. Furthermore, we have seen that in his answer the respondent alleges that the net value of the inheritance was $228,159.62."

In connection with Ramón Díaz Rivera's legal share, as a natural child, in Ramón Pastor Díaz's inheritance (Point No. 2), the Master relates in his report that the respondent testified that he always considered and still considers that his client Ramón Díaz Rivera was entitled by law, as a natural child, to one sixth of the inheritance; that the respondent based his conclusion on the provisions of § 767 of the Civil Code, 1930 ed., to the effect that a natural child is entitled to a portion equal to one half of that pertaining to a legitimate child who has not received any advantage or extra portion, and that he considered that, since the third of extra portion had been assigned by the testator to the only legiti-

mate child, his client's share as a natural child had to be one half of the strict legal portion, to wit, one half of one third.

The Master adds that the share corresponding to the natural child was in this case one of the most important legal questions the respondent had to examine and decide on behalf of his client and that the respondent was bound, as attorney for the natural child, to strive for the most favorable interpretation to his client. After examining that legal question, the Master concludes that "had the respondent examined carefully such an important legal aspect to determine his client's rights, he should have concluded, at least, that there was a reasonable ground under the law and the decisions to claim that his client was entitled to one third the settlement. However, we can not say that his action in this connection was intended to prejudice his client."

As to the third point, that is, Ramón Díaz Rivera's incapacity and the fact that the respondent was aware of the former's mental condition on the date of the settlement, the Master indicates that in his opinion two fundamental questions must be determined: (1) whether on the date of the settlement Ramón Díaz Rivera was mentally incapable of understanding the transaction; and (2)—which in his opinion is the most important—whether the respondent knew or should have known that his client suffered from a mental incapacity. He then examines the evidence heard by him and on the basis thereof concludes that "on the date of the settlement, that is, January 19, 1940, the respondent was a mental weakling or a moron and . . . had no sufficient capacity to understand and reasonably weigh the merits of the settlement in question" and that "the respondent could have learned of his client's limited mental capacity in one of three ways: (1) by hearsay, that is, that someone had told him about it; (2) that Ramón Díaz Rivera's true mental state was apparent to any person dealing with him; or (3) any

acts of his client pointing to that condition." The Master says in addition that "there is uncontroverted evidence which, although not sufficient to show that the respondent was aware of the fact that his client was mentally incapable, did indicate to him that he was dealing with a client of limited intelligence. We refer to the contract for professional services executed on November 14, 1939, wherein Ramón Díaz Rivera and Josefa Rivera, his mother, appear on the one part, and Ramírez Viñas, Manuel Carrasquillo and the respondent, attorneys, on the other. . . . Ramón Díaz Rivera was of age on November 14, 1939, and the respondent knew it. The mother's appearance in this document notwithstanding that the client was of age, tends to show that the parties thereto were aware of the fact that Ramón Díaz Rivera could not at least act intelligently to protect his own interest in the matter of his father's inheritance and that it was necessary or convenient that he be advised by a next of kin (in this case his mother.) There is another uncontroverted fact which must be taken into consideration in determining what the respondent knew or should have known in connection with his client's mental capacity. The respondent testified that a few days prior to the transaction of January 19, 1940, his client, without the respondent's consent and apparently accompanied and advised by one Rafael Cividanes, went to Mayagüez and tried to settle for $8,000 and an automobile and that, had it not been for the intervention of Agustín Font, Ignacio Díaz's attorney, who telephoned him and told him of the visit, the transaction might have been carried out . . . According to the respondent his client insisted after this visit on closing the case and accepting the $10,000 settlement. . . . This conduct of Ramón Díaz Rivera ought to have been another indication to the respondent that he was not dealing with a client of normal intelligence." He then points out that "we must now consider whether Ramón Díaz Rivera's feeble-mindedness in 1940 was or

should have been apparent to any person dealing or doing business with him" and he goes on to discuss this point saying that "the respondent neither knew nor could reasonably have known that he was dealing with an incompetent or with a client who suffered from oligophrenia; the respondent, nevertheless, knew that his client Ramón Díaz Rivera's intelligence was limited and that it was desirable that in decisions regarding important matters he be accompanied and advised by relatives or persons in whom he trusted, especially his mother.

As to the reasonableness of the settlement, the Master states that the respondent testified extensively on his reasons to approve it, to wit: (1) doubt as to the final outcome of the filiation suit, essential basis to be entitled to share in the inheritance; (2) certain pending suits and other obligations assumed by Ignacio Díaz Luzunaris; and (3) Ramón Díaz Rivera's insistence to settle for the aforesaid $10,000. He then states that "after analyzing this situation and considering that the case of *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, had already been decided by 1940, liberalizing the rule of the necessary evidence in filiation suits, and especially taking into consideration the judicial proceeding against Pastor Díaz which resulted in his conviction because he tried to establish by a fraudulent public deed that another person was Ramón Díaz Rivera's father, which evidence was admissible in the second trial, we believe that the respondent could reasonably think that the probabilities of success in the filiation suit were in his favor. However, it is perhaps easier to analyze this situation now retrospectively and in view of what happened. We must accept that the outcome of a suit is never certain and that in this case there was some ground to think of a possible, although not probable, adverse judgment. The respondent was justified, therefore, in compromising some of his client's rights given this contingency, and thus eliminating any possibility that the claim be re-

duced to nothing." The Master indicates, moreover, that "we think that Ramón Díaz Rivera actually insisted in the settlement for $10,000 and that such insistence contributed to the respondent's decision to accept the settlement" and that "after examining all the attendant circumstances under which the respondent had to decide whether or not to accept the $10,000 settlement, we arrive at the conclusion that the settlement is far from reasonable and although we do not consider the amount ridiculous, we do consider it clearly inadequate. The respondent himself considered that the reasonable amount of the settlement was $25,000, not $10,000. It was reasonable to accept a settlement for somewhat less than the entire amount (say, from 20 per cent to a maximum of 40 per cent less) but under the circumstances, regardless of the benefit of a doubt in favor of the respondent, it is impossible to conclude that Ramón Díaz Rivera received a reasonable amount in settlement, especially if we take into account that half of the $10,000 was for attorney's fees. Ramón Díaz Rivera's insistence to settle for the $10,000, did not warrant the respondent's acceptance of the settlement. He did not know that his client was mentally incapacitated to consent but he did know, or should have known, that Ramón Díaz Rivera was not a very intelligent man and that he could not gauge soundly the merits of the settlement in such a complicated affair for a layman inexperienced in transactions involving so many thousands of dollars."

In connection with the fifth point, that is, respondent's undue influence to have Ramón Díaz Rivera accept the settlement and the fact that Josefa Rivera, Ramón Díaz Rivera's mother, was ignored in the agreement of settlement of January 19, 1940, the Master states in his report as follows:

"There was no direct proof that the respondent exercised affirmative undue influence on his client Ramón Díaz Rivera to accept the settlement. Nothing in the record enables us to

conclude that the respondent insisted with Ramón Díaz Rivera to approve the settlement or that he attempted to convince him of the reasonableness thereof.

"The most that can be said is that the respondent failed to take affirmative energetic measures to dissuade his client Ramón Díaz Rivera from accepting the settlement.

"Unquestionably Ramón Díaz Rivera was then anxious to terminate the suit and to collect his share and this, as we have seen, necessarily influenced respondent's final decision to accept the $10,000 settlement.

"The respondent, however, as counsel for Ramón Díaz Rivera, and aware of the fact that he was dealing with a person of a limited intellect and with a scant knowledge of transactions of this nature, could not discharge his responsibility concerning the approval of the settlement by saying that the decision was made by his client and not by him. Furthermore, the respondent, under the attendant circumstances, should have seen to it that the mother, Josefa Rivera, participated in the decision before arriving at a final conclusion.

"We have concluded that Josefa Rivera was not present when the agreement of settlement was signed and that she did not learn of the settlement until February 28, 1940, when her son's filiation suit was tried and the deed of settlement executed, and the amount involved therein paid.

"Taking into consideration that the mother, Josefá Rivera, signed together with her son, already of age, the contract for professional services and that she had gone from Santurce to Guayama in order to be with her son while an agreement was reached or the filiation suit went ahead, the respondent should have notified her of the $10,000 settlement before it was approved. An attorney, of course, does not have to consult with his client's next of kin where his client is of age and has full mental capacity, before accepting a settlement with which the client agrees, but the circumstances of this case exempt it from the general rule.

"There is no evidence supporting the conclusion that the respondent approved the settlement in order to prejudice his client and benefit Ignacio Díaz, the adverse party."

As to the fact that the deed of settlement of February 28, 1940, recited that a certified check, instead of a certifi-

cate of deposit, for $10,000 was delivered to Ramón Díaz Rivera, the Master says that "this charge lacks importance since it is merely an error in nomenclature and not a substantial question," and gives ample reasons for his conclusion.

In connection with the seventh point, that is, regarding respondent's failure to advise the District Court of Guayama of the settlement executed on January 19, 1940, when the case of filiation was tried on February 28, 1940, he says that "the respondent and defendant's counsel, after the settlement of January 19, 1940 was executed, wished to enforce the agreement by obtaining judgment declaring that Ramón Díaz Rivera was an acknowledged natural son of Ramón Pastor Díaz. For this they could either: (1) tell the Court honestly about the settlement and that the defendant admitted the averments of the complaint and would not present evidence to the contrary; (2) without mentioning the settlement (unless the Court asked any questions in regard thereto) tell the Court that the defendant accepted the averments of the complaint and that he would not present evidence to the contrary; and (3) give the impression that the parties still disagreed as to the filiation and go to trial on that basis."

The Master deems that in this case the attorneys chose a path lying rather between the second and the third alternatives: "They did not advise the Court of the settlement and, likewise, they did not inform it expressly that the defendant accepted the averments of the complaint and would not present any evidence to the contrary. However, they did not try to feign during the trial a genuine issue between the parties. Rather, they prosecuted the case in such a way that it had to be apparent to the Court that the defendant had no objection to a judgment for the plaintiff. After the trial had begun and seeing that counsel for the defendant did not cross-examine, the Judge inquired whether the case was

being heard by default, and the respondent explained that although no answer had been filed, no default had been entered, without any further explanation." The Master thinks that "it would have been a better practice for the attorneys for both parties to have adopted either of the first two alternatives. Nevertheless, they did not go so far as to deceive the Court and rather by their actions they implicitly let it know that the defendant had no objection at all to a favorable judgment."

The respondent admits, according to the Master, that the copy of the agreement of settlement of January 19, 1940, which he retained, was not signed by Ignacio Díaz Luzunaris, although he suggested the possibility that there might be some copies signed by the latter. The original agreement was retained by Font, counsel for Ignacio Díaz Luzunaris, and, apparently, it was duly signed by both parties. The Master then says that "the most that could be said is that the respondent should have retained a signed copy of the agreement, but we do not think that his failure to do so made him guilty of misconduct in the exercise of the duties of an attorney towards his client. Apparently the respondent trusted so much his colleague Agustín Font, counsel for the other party, that he did not mind leaving the original contract in his hands, certain that he would never deny the existence of said contract."

As to the fact that the respondent informed his colleague Ramírez Viñas in the filiation suit—on the day of the hearing, February 28, 1940—that there was an offer of settlement for $7,500 when already the agreement of settlement of January 19, 1940, for $10,000 had been signed, the Master states that: "the respondent admits that on the same day of the hearing in the filiation suit . . . he told Mr. Ramírez Viñas that he was offered $7,500 as settlement; he explained that he had no reason to hide from Ramírez Viñas the $10,000 settlement already executed on January 19, 1940,

and that it was possibly a joke and that Carrasquillo knew of the settlement." The Master then summarizes the evidence offered by the parties in this connection and states that "from this summary of the evidence it is clear that for reasons not disclosed thereby the respondent did not inform his colleagues Carrasquillo and Ramírez Viñas, until the last minute, of the existence of the agreement of settlement of January 19, 1940. The respondent went even further to prevent his colleagues from learning about said agreement of settlement, since on February 28, 1940, and shortly before the hearing in the filiation suit he engaged in a conversation with Ramírez Viñas on the basis that there had been no settlement between the parties and that the most was an offer of $7,500. It was not until Ramírez Viñas refused to consent to the settlement for $7,500 that the respondent, after talking to Font, told him that they could settle for $10,000 to which Ramírez Viñas then agreed. Ramírez Viñas, therefore, had to and did think that the settlement was being completed then and there and not that it had been executed more than a month previously by means of a document signed by the parties with the knowledge of respondent and of Font, attorney for the other party. If the respondent had sent Carrasquillo written notice of the agreement of settlement on the same date—January 19, 1940—his conversation with Ramírez Viñas on February 28, 1940, regarding the offer of settlement for $7,500 and later the acceptance of $10,000 would be unexplainable since he had to suppose that Carrasquillo would have informed Ramírez Viñas of the $10,000 settlement. It must be recalled that Ramírez Viñas and Carrasquillo lived in Río Piedras and that the respondent usually talked to Carrasquillo who then informed Ramírez Viñas. In our opinion the respondent failed in his duties as an attorney and was guilty of conduct clearly unbecoming an attorney in failing to inform his colleagues Ramírez Viñas and Carrasquillo of the agreement of settle-

ment of January 19, 1940, and in trying up to the last minute to give the impression that there was no such agreement of settlement and that the offers he had received were for less than $10,000."

The Master points out that Rafael Rivera Zayas, Genaro Cautiño Bruno, Pedro E. Anglade and Celestino Domínguez Rubio, attorneys-at-law, testified as to the respondent's professional reputation. As a result of those testimonies he arrives at the conclusion that "during the many years that the respondent has practiced his profession in Guayama and throughout the Island of Puerto Rico he has earned a good reputation as an honest and trustworthy professional and that he enjoys this same reputation in Guayama, as a citizen."

The Master submitted the foregoing report, and thereupon, on March 26 of this year, we ordered the Clerk of this Court to serve copies thereof on the parties to whom we gave a common term of ten days to file written objections thereto, if any, pursuant to the provisions of Rule 53 (e) 2 of the Rules of Civil Procedure. The respondent filed his objections in time. He challenges the findings contained in the report as to: (1) the value of Pastor Díaz's inheritance on or about January 19, 1940; (2) Díaz Rivera's legal share, as a natural child, in his father's inheritance; (3) Díaz Rivera's incapacity and the fact that the respondent was aware of it on the date of the settlement; (4) the responsibility (sic) of the settlement; and (5) the fact that the respondent informed Ramírez Viñas that there was an offer of settlement for $7,500.

We read those objections. In our opinion they are groundless. We also read thoroughly and carefully the entire transcript of the evidence and examined the exhibits attached thereto. We likewise examined thoroughly and calmly the Master's report. Such reading and examinations

convince us that the report is veracious and that its findings are amply supported by the evidence.

It is unnecessary, of course, to determine in this opinion whether, when an acknowledged natural child concurs with a legitimate child and a widow, the former is entitled to one sixth or one third of his predecessor's inheritance. That is immaterial in this particular proceeding. Be it as it may, the evidence undoubtedly shows that the settlement involved a ridiculous sum.

The main charges were proved. Respondent's conduct, according to the evidence, greatly prejudiced the interests of his client, a person of limited intelligence. The respondent was aware of the latter fact. We need not repeat the charges made or the Master's findings. The former as well as the latter have been extensively reported and are well known.

And the respondent's conduct not only prejudiced his client, but his colleagues Carrasquillo Herpén and Ramírez Viñas as well. He abused the trust they had reposed in him. His action was improper and immoral, and extremely reprehensible. He deserves our reprobation.

Consequently, he shall be disbarred as an attorney and notary.

Mr. Chief Justice Todd, Jr., did not participate herein.